```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK


PATRICIO VINCENTE ARTEAGA        *    Case No. 12-CV-4380(RML)
BERREZUETA, et al.,              *
                                 *
              Plaintiffs,        *    Brooklyn, New York
                                 *    March 13, 2014
      v.                         *
                                 *
ROYAL CROWN PASTRY SHOP, INC.    *
 et al.,                         *
              Defendants.        *
                                 *
   * * * * * * * * * * * * * * * *


         TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
            BEFORE THE HONORABLE ROBERT M. LEVY
               UNITED STATES MAGISTRATE JUDGE

   APPEARANCES:

   For the Plaintiffs:            GEORGE BAUER, ESQ.
                                  JOSH SIMON, ESQ.
                                  DAVID ABRAMOWICZ, ESQ.
                                  Kirkland & Ellis
                                  601 Lexington Avenue
                                  New York, NY  10022

                                  TSEDEYE GABRESELASSIE, ESQ.
                                  National Employment Law
                                   Project
                                  75 Maiden Lane, Suite 601
                                  New York, NY  10038

   For the Defendants:            MIGUEL A. TORELLAS, ESQ.
                                  Polizzotto & Polizzotto, LLC
                                  6911 18th Avenue
                                  Brooklyn, NY  11204


   Proceedings recorded by electronic sound recording, transcript
   produced by transcription service.
```

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

1              (Proceedings commenced at 11:35 a.m.)

2              MR. BAUER:  For the plaintiffs, George Bauer of

3    Kirkland & Ellis, Josh Simon, Kirkland and Ellis, David

4    Abramowicz of Kirkland and Ellis, and Tsedeye Gabreselassie of

5    the National Employment Law Project.  Good afternoon, Your

6    Honor.

7              THE COURT:  Good afternoon.

8              MR. TORELLAS:  I just want to put in my appearance.

9    For the defendants, Joseph Generoso, Theresa Generoso, John

10   Franco Generoso, and Royal Crown, Antico Panficio, Polizzotto

11   and Polizzotto by Miguel Torellas.  Good afternoon, Your

12   Honor.

13             THE COURT:  Good afternoon.  And for the record, we

14   are here on docket number 12-cv-4380, *Berrezueta v. Royal*

15   *Crown Pastry Shop.*  We're here for oral argument.

16             MR. BAUER:  Thank you, Your Honor.

17             THE COURT:  However, you're more comfortable.  If

18   you're more comfortable sitting, feel free.  If you want to

19   use the podium feel free, anything you want is fine.

20             MR. BAUER:  And if you can hear me, I can stand at

21   the table.

22             THE COURT:  Sure.

23             MR. BAUER:  This works.

24             THE COURT:  Yeah.

25             MR. BAUER:  Okay.  Thank you, Your Honor.

3

1        So, as Your Honor is aware, we're here on two cross-

2    motions for summary judgment.  We believe that both motions

3    really turn on three key issues.

4        The first being whether the plaintiffs work under

5    conditions that violated the Fair Labor Standards Act and the

6    New York Labor Law, and what damages result from those

7    violations.

8        The second issue is whether their claims are covered

9    by the Fair Labor Standards Act.

10        And the third issue is employer liability for

11    defendants Joseph Generoso, Theresa Generoso, John Franco

12    Generoso, and Royal Crown Antico Panficio.

13        As for those first two issues, Your Honor, the

14    violations and the damages, being the first issue and the

15    second being coverage, we think those two issues there's

16    really very little to discuss today with those two issues.

17        We think, with the first issue with the violations,

18    we think plaintiff's testimony, their submissions, to date

19    have made it quite clear that they worked under conditions

20    that violated these labor statutes, and that evidence has

21    really remained undisputed.

22        There's no genuine dispute about any of those facts

23    so we think there's really not much of a question, not much of

24    an issue with respect to that first point.

25        THE COURT:  Can I stop you for a second?

4

1          MR. BAUER:  Yes.

2          THE COURT:  Do you agree or disagree with that?

3          MR. TORELLAS:  I agree.

4          THE COURT:  Okay.

5          MR. BAUER:  So as to the second issue, Your Honor,

6     coverage, we similarly think there is very little to discuss

7     with that issue as well.  As our papers made clear, there's

8     two alternative means of establishing coverage here; the

9     individual coverage and the enterprise coverage.

10          And, you know, a lot of ink was spilled on the

11     enterprise coverage in the papers, but we think the fact got

12     lost in there that the individual coverage is, you know, an

13     equal alternative to establishing coverage, and we think the

14     facts there are quite clear that plaintiffs were producing

15     products, were baking bread, were handling bread, packing

16     bread that was being shipped in interstate commerce.

17          And we don't think there's an issue with that.  And

18     in fact defendant's opposition papers didn't even argue

19     against that point.

20          So we think based on just that individual coverage,

21     as well as the enterprise coverage, but individual coverage by

22     itself is enough to establish coverage here and you know, we

23     can discuss a little bit more about the enterprise issue but I

24     don't even think it's necessary here, just because of the

25     establishment of the individual coverage provision.

1          THE COURT:  And what's the defendant's perspective

2     of the individual coverage?

3          MR. TORELLAS:  Well, basically my perspective is

4     that there may be coverage whereas the defaulting defendants

5     are involved.  But certainly it is plaintiff's burden to prove

6     that there is coverage as to the defendants that are still

7     represented herein.

8          THE COURT:  Okay.  So, I'll hear from you more.

9          MR. BAUER:  Well, just to respond to that point if I

10    may, briefly, the coverage issue is not really tied to any

11    specific employer.  The individual coverage is really based on

12    the employee.

13          And there's really no facts disputing -- or there's

14    no dispute about the fact that the plaintiffs themselves were

15    engaged in the production of goods for commerce, sufficient to

16    establish that individual coverage aspect.

17          So, we think on that point, you know,

18    differentiating between the defaulting defendants and the non-

19    defaulting defendants, is not really relevant with respect to

20    the individual coverage issue.

21          MR. TORELLAS:  As far as commerce goes is the -- my

22    understanding is the requirement involves interstate commerce.

23    Or is it just commerce?

24          MR. BAUER:  It's interstate commerce, Your Honor.

25    And the plaintiffs have established in this case that they did

1    work on bread that was shipped in interstate commerce

2    shipments, to New Jersey to be specific.

3             MR. TORELLAS:  I disagree, Your Honor.  There was

4    testimony by one of the moving defendants herein that his

5    business, which has been dismissed out of the action, had one

6    client in New Jersey.  I've seen no other evidence that

7    there's been any kind of involvement with New Jersey by any

8    defendant that's still in the case.

9             THE COURT:  And -- well, I'm sorry.  I'll let you

10   respond.

11            MR. BAUER:  Well again, Your Honor, the fact that

12   the Defendant is working on bread that was shipped in

13   interstate commerce, whether it be one of the defendants that

14   defaulted or one of the defendants that have not defaulted,

15   it's not relevant.  It's the fact that the Plaintiffs

16   themselves were working on this bread.

17            And the bread being shipped to New Jersey is

18   sufficient for interstate commerce; the fact that they

19   produced this bread, they baked it, they handled it, they

20   packed it.

21            All of that is sufficient to establish interstate

22   coverage issue, and I'm not really hearing a dispute about

23   those facts.  So I believe that that would be sufficient to

24   establish coverage based on the individual coverage.

25            THE COURT:  So you're saying there's no factual

1    dispute but they're each drawing different inferences as to

2    what the legal import of that is.

3              MR. BAUER:  I believe there's no factual dispute

4    about the fact that the plaintiffs were engaged in the

5    production of goods for interstate commerce.  I think there's

6    a dispute -- well, actually I don't think there's --

7              THE COURT:  Whether that's sufficient.

8              MR. BAUER:  Yeah.  Quite right.  Right.  And we

9    think as a matter of law, that is sufficient.

10             MR. TORELLAS:  I think there is a factual dispute,

11   Your Honor.  Our position is that the Plaintiffs did not work

12   for specifically Defendant Joseph Generoso or Royal Crown

13   Pastry Shop II, which became Royal Crown Bakery.  Those are

14   the entities that shipped to New Jersey.

15             Our position is that the Plaintiffs worked solely

16   for defaulting defendant Royal Crown Pastry Shop I, and Frank

17   Generoso.  And there has been no testimony or evidence that

18   they shipped anything to New Jersey.

19             MR. BAUER:  If I may respond, Your Honor?

20             THE COURT:  Yes.

21             MR. BAUER:  Again, we think that that point is going

22   to the third issue of liability.  Just in terms of coverage,

23   again, it's not concerned with what any of the other

24   defendants are doing.  The individual coverage piece is not

25   concerned with the other defendants.

1            It's concerned with what the Plaintiffs themselves

2    were doing, and the fact that they were -- and it doesn't seem

3    like the defendants are disputing that, that the Plaintiffs

4    themselves were engaged in shipping bread to New Jersey.

5            And that, by itself is sufficient for the individual

6    -- again, it's the employer's conduct.  I'm sorry, the

7    employees's conduct.

8            And to take that a step further, and this goes to

9    the enterprise issue.  I'm not going to go into that too

10   deeply unless Your Honor would like to discuss it, but there

11   is evidence that these other defendants were shipping bread

12   out of state.  Joseph Generoso has testified in his deposition

13   that Royal Crown Bakery was shipping bread out of state to a

14   restaurant in New Jersey as well, Atlantic City.

15           So there is evidence there that these other

16   defendants were shipping bread out of state.  But again, for

17   the individual coverage piece, it's just what the employee

18   was doing, not what the other defendants were doing.

19           MR. TORELLAS:  Can I address that?

20           THE COURT:  Sure.

21           MR. TORELLAS:  I think we're both pretty much saying

22   the same thing.

23           We're conceding that Royal Crown Bakery and Joseph

24   Generoso did testify that they are the only entity that

25   shipped to New Jersey.

1          Our point is that the Plaintiffs didn't work for

2     Royal Crown Bakery, and in fact Royal Crown Bakery isn't even

3     in the case anymore.

4          I think that individual coverage would apply if

5     there was some evidence that Royal Crown Pastry Shop I, or

6     some entity that the plaintiffs worked for, had shipped bread

7     to New Jersey.  But there hasn't been any evidence of that.

8          MR. BAUER:  It seems to me, it's my understanding

9     based on that, that Defendants are not taking an issue with

10    the individual coverage aspect; that they're not disputing

11    that the Plaintiffs, themselves, were engaged in shipping

12    bread in interstate --

13          MR. TORELLAS:  I am disputing that.

14          MR. BAUER:  Okay.  Well, we think, Your Honor, we

15    think the facts -- you know, the record is clear.  We've made

16    it clear in our submissions that the plaintiffs were in fact

17    engaged in this activity of shipping bread in interstate

18    commerce.  There's no facts to dispute that and you know,

19    Defendant's opposition papers didn't take issue with that.  So

20    we think it's ripe for summary judgment on that issue.

21          THE COURT:  And I think Defendant's position is that

22    it's as if these plaintiffs were working for Coca-Cola and

23    shipping Coca-Cola to another state, and therefore that

24    there's no individual coverage because there's no real

25    relationship between them and the defendants in the case.  Is

10

1          that what you're saying pretty much?  Or am I caricaturing it?

2                  MR. TORELLAS:  Sort of, yes, but there's also been

3          no evidence that they produced any bread at all that was

4          shipped to New Jersey.

5                  THE COURT:  Oh, I see.  You're disputing that fact

6          as well?

7                  MR. TORELLAS:  Yes.

8                  MR. BAUER:  Well, on that point we think if you look

9          at the record as laid out in our papers, there is certainly

10         evidence of that; the Plaintiff's own testimony there, and

11         it's remained undisputed up until this point, so we disagree.

12         We think there is no question of fact there and we think the

13         Plaintiffs are entitled to summary judgment on that point.

14                 THE COURT:  Did any of your clients testify as to

15         that issue, or was it only the Plaintiffs?

16                 MR. TORELLAS:  He may be right that the

17         Plaintiffs -- I don't recall the Plaintiffs testifying at

18         their depositions about shipping anything to New Jersey.  It

19         may be -- maybe you're referring to one of their affidavits

20         and as part of the motion.

21                 THE COURT:  Was it at the default hearing?

22                 MR. BAUER:  Yes, Your Honor.  There's testimony

23         during the inquest for damages on the default judgment motion,

24         as well as some submissions there, and you know, if that

25         testimony was not elicited in the depositions because the

1    question wasn't asked.  So the point was made in their

2    testimony and the damages inquest, and it's remained

3    undisputed, so we think it's just as valid.

4              THE COURT:  Okay.

5              MR. BAUER:  And so the third issue, the --

6              THE COURT:  Well, why don't you talk about

7    enterprise liability?

8              MR. BAUER:  Pardon me?

9              THE COURT:  Excuse me.  Go to the next issue, the

10   enterprise coverage.

11             MR. BAUER:  Oh, certainly, Your Honor.

12             So with the enterprise issue we think that the same

13   result is going to occur.  We think the facts are clear that

14   these businesses, and to be specific it's Royal Crown I, Royal

15   Crown Pastry Shop I, Royal Crown Pastry Shop II, Royal Crown

16   Bakery, Royal Crown Antico Panificio, and Magnifico Catering,

17   all of these entities were engaged in related activities for a

18   common business purposes under a unified operation.

19             And we think that the facts that are established are

20   clear, and they've remained undisputed.  It's the fact that

21   these businesses bake the same products.  They baked the same

22   products with the same recipes, all owned by members of the

23   same family.

24             They all benefitted from an association with this

25   Royal Crown brand which, if you look at the record as laid out

1   in our papers, this was an intentional association; this brand

2   had a reputation in the neighborhood.  These businesses were

3   all benefitting from this, you know, reputation in the

4   neighborhood.  And we think all of that, taken together

5   establishes that they were operating as an enterprise.

6          And what's more, to qualify for coverage you need

7   not just have the enterprise, you also need to establish these

8   jurisdictional requirements.  One of which is an interstate

9   requirement, and the other is a minimum revenue requirement.

10  And both of those prongs have been established here as well.

11         And this goes back to the facts, what we were

12  discussing a short while ago, about Royal Crown Bakery and

13  Royal Crown Pastry Shop I, both delivered products out of

14  state.  You know, that testimony has remained undisputed.

15         In addition to that, with the interstate requirement

16  and the enterprise issue, the employees were, you know,

17  handling goods and handling equipment that was shipped in

18  interstate commerce.  And for enterprise purposes, that's

19  sufficient as well, under the law.  So we believe that

20  prong -- there's no real question that that prong has been

21  satisfied.

22         And with respect to the revenue requirement, we

23  think, you know -- it's not that we think, the attached

24  records that we've attached to our papers will establish that

25  the minimum revenue requirements have been established.  So we

1    don't think there's a question there either, Your Honor.

2        We think under both the individual coverage and the

3    enterprise coverage, both of which by themselves is

4    sufficient, under both prongs, Plaintiffs are entitled to

5    summary judgment for a FLSA coverage.

6        MR. TORELLAS:  Well, the first thing I'll point out

7    is that all of the defendants that were supposedly part of

8    this enterprise, except for Royal Crown Antico Panificio, are

9    out of the case for one reason or another.

10        Three of them were subject to a stipulation of

11    voluntary dismissal, and one of them defaulted.  The only one

12    that's still active in the case is Royal Crown Antico

13    Panificio.

14        Maybe I'm misreading it, but basically the fact that

15    they're out of the case leads me to think that the fact that

16    there are three individuals and one corporation which occupied

17    the same premises as the defaulting defendants, that basically

18    the connection that Plaintiff was trying to make was whether

19    the three individuals were part of the defaulting defendants'

20    businesses as employers.

21        As far as the enterprise argument, there has been no

22    testimony, no evidence that there was any kind of connection

23    between the five businesses, including the four that are no

24    longer in the case.

25        There has been no evidence that they shared any kind

14

1    of monies with each other.  They each ran their own businesses

2    separate and distinct.

3         The only business that testifies to doing anything

4    in interstate commerce was Royal Crown Bakery, and there's

5    been no proof that the plaintiffs were employed by Royal Crown

6    Bakery.

7         As a matter of fact, their testimony at their

8    depositions were that they worked solely for Royal Crown

9    Pastry Shop I, which is a defaulting defendant.

10        Furthermore, as for the income argument, I don't see

11   how given that these corporations are no longer in the case, I

12   don't see how they could still be using their financial

13   information to try to make this argument.

14        But in any event, none of these individually reached

15   the threshold of $500,000.  Maybe if you put them all

16   together, but then again, four of them are no longer in the

17   case.  So I think that they haven't met the burden of

18   establishing that there's a common enterprise between all the

19   businesses.

20        MR. BAUER:  Well, Your Honor, I think that argument

21   is confusing the enterprise and the employer issues.  Again,

22   the enterprise issue goes to coverage and the employer issue

23   goes to liability.

24        The defendants that were dismissed from this case

25   were dismissed, not because they weren't part of the

1    enterprise.  They were dismissed because those businesses were

2    not employers.  But you don't need to be an employer to be

3    part of the larger enterprise.

4              You know, the point of the enterprise coverage

5    provision is to pull in businesses that would not otherwise be

6    employers, because of their association with other businesses

7    that makes them a larger business entity.

8              So the fact that these businesses were dismissed is

9    an irrelevant point because, you know, just because they

10   weren't employers doesn't mean they can't contribute to the

11   enterprise.

12             And on that same point, you know, the fact that one

13   business within this enterprise delivered out of state, you

14   know, that's sufficient to pull the enterprise together.  To

15   hold the enterprise under the coverage of the FLSA.

16             Same goes with the income.  It's not that each

17   individual employer needs to meet this minimum threshold.

18   It's that the enterprise as a whole meets the minimum

19   threshold.

20             And, you know as the Defendants mentioned, if you

21   put them all together, yes, they do meet the minimum

22   requirements, and that's the test under the law.  It's to pull

23   all of these entities together as part of the enterprise.

24             And just as the final point to respond to, that

25   there was no evidence that these businesses, you know, were

1    involved with one another.

2              Again, you need just to look at the record

3    which has been laid out in our papers that these businesses

4    did intend to associate themselves with one another, to

5    benefit from this brand name, to use the same recipes, the

6    same products.  You know, these are all related activities

7    that were being done for a business purpose of benefitting

8    from this reputation, which we think is sufficient to

9    establish coverage.

10             But again, Your Honor, we don't want to lose the

11   fact that the individual coverage piece, which really by

12   itself is sufficient, you know, is another alternative avenue

13   in addition to enterprise.  It's not that we need both.  It's

14   that we need either, and we think that we've established both

15   in this case.

16             MR. TORELLAS:  Well, just even assuming that the

17   other corporations can be included for the enterprise

18   argument, I don't feel that the record is going to show that

19   there is enough of a connection between the enterprises.  It's

20   just the fact that they all happen to sell food.  It's a

21   different type of foods that they all sell.

22             One of them sold sandwiches.  One of them sold

23   pastries.  I provided the menus to the plaintiffs.  I don't

24   think there is enough evidence in the record to show that they

25   actually did work for a common purpose with each other.

1    There's no evidence of them sharing any financial gain with

2    each other, as I said.  And not even all of them have the

3    Royal Crown brand, which is basically what Plaintiffs are

4    holding their hat on.

5            So I just don't feel that there's enough there for

6    common enterprise.

7            MR. BAUER:  If I may respond briefly, Your Honor?

8            THE COURT:  Yeah.  Yeah.

9            MR. BAUER:  Just starting with the last point, the

10   businesses again we're talking about are the Royal Crown

11   Pastry Shop I, Royal Crown Pastry Shop II, Royal Crown Bakery,

12   Royal Crown Antico Panificio, and the last one, Magnifico

13   Catering, doesn't have Royal Crown in its official name, but

14   there's testimony in the record, and it's laid out in our

15   papers, that there was a big sign, Royal Crown, outside the

16   store.  And that sign was put there for the purpose of

17   associating it with the other Royal Crown.

18           So there's certainly evidence to establish that

19   these businesses were operated together.  So we think that

20   point is -- we think that's a moot point.

21           THE COURT:  Was there any -- just to show common

22   operation or control, was there any management overlap that

23   was there, or not necessarily?  Or is that not necessary?

24           MR. BAUER:  Well, it's not -- we don't think it's

25   necessarily necessary.  But there was overlapping in this

1     case, Your Honor, again Royal Crown I, Royal Crown II were

2     both owned by Joseph Generoso and Frank Generoso, Royal Crown

3     Bakers, that owned by Joseph Generoso, using the same recipes

4     that were used with Frank Generoso.  Magnifico Catering was

5     owned by Theresa Generoso.

6          Royal Crown Antico Panificio, which operated at the

7     6512 location, that was owned by John Franco Generoso, Frank

8     Generoso helped him operate that.  So there's commingling

9     ownership all over the place here, Your Honor.  And we think,

10    you know, those facts were laid out in our papers and they're

11    undisputed, and we think they establish the enterprise

12    coverage.

13         So moving onto the third again --

14         THE COURT:  Let me just -- what about Joseph?  Did

15    Joseph have anything to do with Royal Crown Pastry Shop?

16         MR. BAUER:  He was the owner, Your Honor.

17         THE COURT:  After the early 1990s, did he

18    actually -- what did he do?  What was his involvement with it

19    up to the early 1990s?

20         MR. BAUER:  So, going into the employer liability --

21         THE COURT:  Yeah.

22         MR. BAUER:  -- because this is where it's going to

23    bring us.  So with Joseph, he was the owner, Your Honor.  He

24    was the owner of Royal Crown Pastry Shop through the end of

25    the relevant time period, which in this case ended in 2011.

1    He was the owner up until 2012.  And in fact we have a New

2    York State Department of State record, I believe it was a

3    certificate of dissolution, for Royal Crown I, which listed

4    Joseph Generoso as the principal executive officer.

5           So, you know, beginning when it was open in 1987,

6    all the way through to its dissolution in 2012, Joseph

7    Generoso was the owner of this business.

8           And as the owner, he has testified that he possessed

9    the power to control the workers, the conditions of the

10   employment for the workers who worked there.

11          He testified that because he was the owner he had

12   the power to hire and fire employees, he had the power to set

13   worker's wages, to set their schedules.  To otherwise control

14   the conditions of their employment.

15          And that fact has remained undisputed and you know,

16   since he maintains his ownership for that, since he possessed

17   that power throughout, we think that he is an employer

18   throughout because the test for the employer liability is

19   whether the Defendant possessed the power to control the

20   Plaintiffs in point.  That's the quote, Your Honor, and what

21   if he testified to having that, he possessed that power.  So

22   for that reason we think he is a -- Plaintiffs are entitled to

23   summary judgment on the issue that he is an employer.

24          THE COURT:  And he testified at his deposition that

25   he had that power?

1          MR. BAUER:  That he had that power by virtue of his

2     ownership of the business.  Yes, Your Honor.

3          THE COURT:  His 50 percent ownership?

4          MR. BAUER:  Yes.  Yes, Your Honor.

5          THE COURT:  And does it matter whether he actually

6     used that power?  In other words, as I recall, Plaintiffs

7     didn't testify at the inquest hearing that they were hired by

8     Joseph.  They were hired by Frank, weren't they?

9          MR. BAUER:  Yes, Your Honor.

10          THE COURT:  Okay.  Does it matter as long as someone

11     has -- as long as Joseph has the power, does it matter whether

12     Frank actually hired them or not?

13          MR. BAUER:  Well, yes, Your Honor.  And again, in

14     this circuit it's whether he possessed the power to control

15     their employment, and that is the real test.

16          And the reason for that is evident in this case

17     where plaintiffs worked for a very long time under substandard

18     conditions.  The law seeks to hold accountable those who had

19     the power to fix that; had the power to correct those problems

20     --

21          THE COURT:  Yes.

22          MR. BAUER:  -- but chose not to do so.  And again,

23     Joseph Generoso has testified that he did possess that power

24     but he never fixed the problem.  And therefore, you know, he

25     should be responsible for that as the law so requires.

1          THE COURT:  Yes.  Okay.  So, he had the power to set

2    their work schedules, he had the power to hire them, the power

3    to fire them, the power to set the pay, but he didn't

4    necessarily exercise that power, but it doesn't matter because

5    his having the power makes him liable or responsible under the

6    law to make sure that the conditions, the proper conditions,

7    the work conditions, are implemented.

8          MR. BAUER:  Yes, Your Honor.  So it's Plaintiff's

9    position that the fact that he possessed this power is

10   sufficient.

11         To the extent that he exercised it again, we don't

12   believe that that's necessary under the law.  We think that

13   it's more than sufficient that he possess the power.

14         But given his ownership, given the fact that he did

15   possess that power, given the fact that the records indicate

16   that he maintained that ownership through 2012, you know,

17   there still may be a question of fact as to whether he

18   exercised that power.

19         But again, we don't think that that's a question

20   that needs to be answered under the law because we think it's

21   sufficient that he possessed the power.

22         THE COURT:  So the Court should not reach that issue

23   then?

24         MR. BAUER:  No, we think that --

25         THE COURT:  We don't have to resolve the fact.  A

```
 1          jury doesn't have to decide that and it's not a material fact.

 2                    MR. BAUER:  Correct, Your Honor.

 3                    THE COURT:  Because he had the power.

 4                    MR. BAUER:  Correct, Your Honor.

 5                    THE COURT:  Okay.  Do you agree or disagree?

 6                    MR. TORELLAS:  I disagree, Your Honor.  First of all

 7          Mr. Generoso's testimony was that as of the day that he opened

 8          Royal Crown Pastry Shop --

 9                    THE COURT:  Mr. Joseph Generoso?

10                    MR. TORELLAS:  Mr. Joseph Generoso, yes.

11                    THE COURT:  Okay.

12                    MR. TORELLAS:  His testimony was that as of the day

13          he opened Royal Crown Pastry Shop II, he no longer had

14          anything to do with the day-to-day operation of Royal Crown

15          Pastry Shop I; that basically Frank Generoso handled the day-

16          to-day operation, he's the one who hired the Plaintiffs, he's

17          the one who was in charge of their working conditions, their

18          pay.

19                    Frank Generoso is the one who kept all of the

20          employment records.  Joseph Generoso did not have access to

21          any of the books, he did not have the actual authority, given

22          that he testified for several reasons.

23                    Basically it was Frank's business.  He had his own

24          business to run.  And the way that the family dynamic works

25          was that Frank Generoso, being the older brother, he wouldn't
```

1    have dared to overstep Frank's authority.

2           So the fact that he may have had some authority on

3    paper basically was irrelevant.

4           As far as to how long he had that authority, the

5    Frank and Joseph executed a shareholder's agreement in

6    September 11th of 2007 whereby they each relinquished any

7    power or control of each other's businesses.  They executed

8    releases at that time.

9           Shortly thereafter Joseph Generoso testified that

10   they executed whatever documents were necessary to relinquish

11   the shares of each other's corporations.  And the fact that

12   the corporations remained open under the Department of the

13   State's records until 2012, is really irrelevant because it's

14   the agreement that controls.

15          So, the fact that he did not have any of the control

16   -- these are basically the standards to determine whether he

17   was an employer or not.  It's not simply whether he's named on

18   paper.

19          Okay, so given that he did not have any control of

20   the day-to-day operations, the plaintiffs themselves testified

21   that they didn't know who Joseph Generoso was.  So he

22   certainly did not have any power to tell them what to do.  He

23   did not set their wages.  He had no contact with them at all.

24          So therefore I think it would be totally unfair for

25   the Court to find that he was actually an employer of theirs.

24

1          But in the event that the Court does, basically any

2     ownership interest that he would have had in Royal Crown

3     Pastry Shop I should be deemed to have ended on September

4     11th, 2007 when they signed the shareholder's agreement and

5     releases, et cetera, et cetera.

6          THE COURT:  So, are you saying that it doesn't

7     matter whether or not Joseph Generoso had the legal authority

8     to control pay, working hours, et cetera?  It's whether he

9     exercised the control that's the issue.  Is that what you're

10    saying?

11         MR. TORELLAS:  Absolutely.  Absolutely.

12         THE COURT:  And do you think the case law is

13    unanimous on that or do you think there is a split in the case

14    law, or the Plaintiff is correct?

15         MR. TORELLAS:  I think it's really up to the Court's

16    interpretation.  I believe the case law may be split on the

17    issue.

18         THE COURT:  Uh-huh.

19         MR. TORELLAS:  But I think it's very clear from the

20    cases that I've seen on the cases that have set forth the

21    standards that we're using here today, that the day to day

22    operation and his contact and actual exercising of the

23    authority is really more controlling.

24         THE COURT:  Uh-huh.  What if the facts were

25    different?  I mean, what if you had a case where Joseph was

1    the sole owner, nobody else, but he had an assistant who was

2    the only person that anyone ever saw; any of the employees

3    saw.  And the assistant did the hiring; he delegated the

4    hiring to the assistant, he delegated all the pay issues, he

5    put the payroll -- the assistant gave out all the checks or

6    handed out money in a cash envelope?

7            Actually, I had a case like this.

8            MR. TORELLAS:  Well, that's a very different

9    situation.  Here we're talking about 50/50 ownership.  We're

10   not talking about a sole owner who is basically delegating.

11   He's actually taking an active act of delegating it to

12   somebody else.

13           THE COURT:  Right.

14           MR. TORELLAS:  That wasn't the case here.  It was

15   50/50 ownership.  They worked together at one time and a

16   couple years later, around 1994, they split up.  They just

17   left it the same on paper, but they actually had no

18   interaction with each other and each other's businesses.

19           So I think it's quite different than the situation

20   that you're describing, Your Honor.

21           THE COURT:  Uh-huh.  So you're saying that being an

22   owner on paper doesn't mean that he had any authority?

23           MR. TORELLAS:  Well, I think that the test is

24   basically the economic realities test.  The reality of the

25   situation is that he did not have the power -- you know, he

1    may have had the power on paper, but did not have the actual

2    authority.  He'd have to basically overstep his older brother

3    and if you listen to his deposition testimony, if you read it,

4    you'll see that that could never happen.

5              They even had another brother who was older than

6    both of them who worked at the bakery, who was not on paper,

7    and they both deferred to him for all the decisions that were

8    made.

9              So the actual reality of the situation is that

10   regardless of what was on paper, and he actually said that on

11   his deposition, you know, he did not maintain -- he did not

12   feel like he had the authority to do anything as far as

13   anything to do with Royal Crown Pastry Shop I, that it was all

14   Frank Generoso's bakery.  He had his own bakery to run.  And

15   as such, you know, he should not be held liable for the acts

16   of his brother.

17             THE COURT:  To what extent did the different

18   businesses share employees?

19             MR. TORELLAS:  None.

20             THE COURT:  None?

21             MR. TORELLAS:  None.  Totally separate employees,

22   totally separate records.  Like I said, the Plaintiffs in this

23   case, at their depositions, they didn't even know who Joseph

24   Generoso was.  They had seen him maybe once or twice.  They

25   thought his name was John.  John happened to be their older

1    brother's name, so it's not even clear which John they were

2    referring to.  It's the same with the other defendants in the

3    case, except maybe John Franco.

4           They had no contact with Joseph at all.  Like I

5    said, Joseph had his own staff, Frank had his own staff.  He

6    basically ran it -- he had is wife working behind the -- doing

7    the books.  Frank Generoso had Theresa come in in the summer

8    and work behind the counter a couple of times.  You know, they

9    ran totally separate businesses.

10          THE COURT:  Uh-huh.  And the same thing with the

11   finances?  Were the finances ever commingled, or were they --

12          MR. TORELLAS:  Never.

13          THE COURT:  -- always separate?

14          MR. TORELLAS:  Always separate.

15          THE COURT:  Uh-huh.  And in the record is there

16   testimony that bread at 6512 14th Avenue was ever delivered to

17   Magnifico?

18          MR. TORELLAS:  I believe Magnifico did purchase

19   bread from 6512, yes.  But that was Theresa Generoso's

20   business.

21          THE COURT:  It was a purchase?  They paid for it, or

22   was it just dropped off?

23          MR. TORELLAS:  They paid for it, yes.  They paid for

24   it.

25          THE COURT:  And that's in the record?

1     MR. TORELLAS:  Yes.

2     THE COURT:  Okay.

3     MR. BAUER:  Yes, Your Honor.  So, to respond to a

4 couple of those points.

5     First, you know, it's not the Plaintiff's

6 responsibility to keep track of their employers as Mr.

7 Torellas mentioned.  It's an economic reality test that

8 decides who is the employer.

9     So it's not the -- you know, it's our responsibility

10 to find out who the employer is.  It's not the Plaintiff's.

11     And to address Joseph Generoso's testimony for a few

12 seconds, looking at the testimony it's crystal clear, Your

13 Honor, I'm not sure how the evidence can say that, you know,

14 he wasn't saying that he had the authority to do these things.

15     His testimony is quite clear.  I'm not going to read

16 it all.  It's in his deposition, page 129 to 130, but he was

17 asked, "Do you have the authority to fire somebody?"  He said,

18 "Correct."  He was asked, "Do you have the power to tell

19 somebody to work a certain schedule?"  He said, "Correct."  He

20 was asked, "Do you have the power to control --"

21     THE COURT:  All right.

22     MR. BAUER:  -- "certain conditions of employment?"

23 He said, "I had that power."

24     So this was not just ownership on paper, Your Honor.

25 The Defendant acknowledged, he knew that he had the power to

1     control their employment.  It was not just a name on a piece

2     of paper.  You know, he knew that he possessed the power, and

3     he did in fact possess the power.  And nothing has disputed

4     that testimony as so far.

5             THE COURT:  And then one of the plaintiffs referred

6     to Joseph as one of the bosses, Ricardo?

7             MR. BAUER:  Pardon me?

8             THE COURT:  Did one of the plaintiffs refer to

9     Joseph as one of the -- as a boss in the deposition?

10            MR. BAUER:  I believe he did, Your Honor, yes.

11    Joseph was involved to a greater extent early in Ricardo's

12    work experience.  Ricardo started in 1994.  That's outside of

13    the relevant time period in terms of damages, et cetera, but

14    he's been working there since 1994.

15            Joseph was involved heavily early on, but you know,

16    he maintained an ownership interest through the end of the

17    relevant period and he maintained the authority over the

18    Plaintiff's work conditions throughout that whole time.

19            THE COURT:  So the reference to Joseph as one of the

20    bosses was outside the relevant period, or within the relevant

21    period?

22            MR. BAUER:  You know, I'm not sure about that

23    specific reference.

24            THE COURT:  Okay.  It's at page 41 of the

25    deposition.  But I could just go back and look over that, yes.

1     Forty-one, lines 14 to 41.

2            MR. BAUER:  But again, Ricardo had worked under

3     Joseph directly for a very long time, and he understood that

4     Joseph was still, you know, an owner of the business and was

5     employer of the business.  It's not true that Ricardo never

6     met Joseph.  You know, he worked directly under him.  He knew

7     that Joseph was the owner and he understood that Joseph was

8     the owner through the relevant time period.

9            So that specific reference might have been to a time

10    period outside of the relevant period, but we think that the

11    same principle applied through the relevant time period.

12           THE COURT:  Okay.  So just so I understand how far

13    your argument is going here, Joseph is a 50 percent owner on

14    paper.

15           MR. BAUER:  Yes.

16           THE COURT:  Is that sufficient?

17           MR. BAUER:  No, Your Honor.  That's not what we had

18    here.

19           THE COURT:  No, I understand that.  I'm just taking

20    it incrementally.

21           Okay.  So you have ownership, plus.  And so

22    ownership plus saying he had the power to hire and fire, to

23    set hours, set the schedule, control the conditions of

24    employment, sign paychecks.  So being a 50 percent owner and

25    having that power, I'm not saying exercising it, but having

1      that power, is that enough --

2              MR. BAUER:  Yes, Your Honor.

3              THE COURT:  -- to satisfy the economic realities?

4      Yes.

5              MR. BAUER:  Yes, Your Honor.

6              THE COURT:  Even if he doesn't exercise them?

7              MR. BAUER:  Yes, Your Honor.  We think --

8              THE COURT:  That's where you're differing, right?

9      Isn't that your disagreement?

10             MR. TORELLAS:  Yes.  Pretty much, Your Honor.

11             I'd also like to point out that the testimony that

12     he's referring to, if you read it, it specifies that the

13     question was asked before they asked him about the authority

14     was, are you still partners on paper and paper only?

15             And he was specifically asked to draw a legal

16     conclusion that based on the fact that it was on paper only,

17     do you think you have the authority, et cetera, et cetera.

18             It wasn't specifically whether he just thought in

19     general whether he had the authority, because basically he

20     deferred to what I had told you earlier, that he would defer

21     to his brother, Frank, and to his older brother, and that type

22     of stuff.  So I'd like to make that distinction as to the

23     testimony that he's reading off of the deposition here.

24             THE COURT:  Yes.

25             MR. TORELLAS:  But, yeah, that seems to be --

1          THE COURT:  So is there a difference between --

2          MR. TORELLAS:  -- basically the difference that we

3     have, yes.

4          THE COURT:  But if he knew he had the authority and

5     if he wanted to, he could do it.  But out of personal

6     deference to his brother he did --

7          MR. BAUER:  Well, I --

8          MR. TORELLAS:  Well, there is also an element of

9     willfulness, I will say, that he would actually have to know

10    what was going on in his brother's business and then do

11    nothing about it.

12         THE COURT:  Uh-huh.

13         MR. TORELLAS:  To be held liable.  But basically the

14    fact that he hardly even went into his brother's business

15    after they separated the businesses, I mean, I don't know if

16    it's clear here, but the underlying tone of it is that the

17    brothers, at a certain point, didn't get along with each other

18    and had very little contact with each other.  So there was

19    really no way that he would know what was going on in his

20    brother's business.

21         And similarly, Frank wouldn't know what was going on

22    with Joseph's business.

23         THE COURT:  Is that in the record, or is that just

24    something that you know?

25         MR. TORELLAS:  There is some questions in Joseph's

1    deposition where they asked him about his brother, and he

2    says, I don't want to say anything bad about my brother.

3        And if you look at the deposition testimony of not

4    only Joseph, but the other -- his children, Theresa and John

5    Franco who are still in the case, they basically refer to the

6    fact that they haven't spoken to Joseph in a long time, that

7    there was a falling out between the brothers, that type of

8    thing.  And I think that's pretty common knowledge to me and

9    the Plaintiff's counsel is aware of it too.

10       MR. BAUER:  Well, as to this willfulness issue, Your

11   Honor, that's not a requirement for employer liability.  Now

12   willfulness will come in for statute of limitations purposes

13   for extending the statute from two to three years for FLSA

14   purposes.  But we haven't moved for that issue on summary

15   judgment.  So that willfulness issue is not at play here.

16       As to Joseph's testimony, I think there's a bit of a

17   mischaracterization.  The question was not, okay, as 50

18   percent owner on paper, do you think as a result of the law of

19   the State of New York, did you have this power?  It was, as 50

20   percent owner you had this authority, correct?

21       Yes, Your Honor.  Yes, I had that -- so this was not

22   a hypothetical question.  This was a question of, okay, you

23   did have this power, you did have this ownership interest, did

24   you have the power?  Yes, I had that power.  It was not

25   hypothetical.  It was a statement of actual fact at that time.

1          THE COURT:  So he was saying, I'm not a silent

2     owner.  If I want to I have the power and I can exercise it?

3          MR. BAUER:  Yes, Your Honor.  And again, when we

4     directed to page 129 and 130, because we think that a string

5     of quotes in the deposition, it's crystal clear about what was

6     being asked and what was being answered.  And it was not

7     hypothetical.

8          One other point if I may respond to Mr. Torellas?

9     He had mentioned that, you know, his brother, Frank Generoso,

10    was really involved and he's the one who should really be

11    responsible.  But, you know, under the law you may have more

12    than one defendant liable as an employer.  Just because one

13    person is employed doesn't mean that somebody else is not an

14    employer.

15          And, you know, again, the question is whether each

16    one of these individuals, or each one of these entities had

17    the power to control the Plaintiff's employment.  That's the

18    real overarching question that needs to be answered.  And with

19    respect to Joseph, that is the fact.  You know, that's what he

20    said was the fact, and that's what we think entitles

21    Plaintiffs to summary judgment on that issue.

22          THE COURT:  If he hadn't said that, would you still

23    be entitled to summary judgment on that issue?

24          MR. BAUER:  If he hadn't said that he possessed the

25    power?

1            THE COURT:  Uh-huh.

2            MR. BAUER:  No, Your Honor.  But he didn't.

3            THE COURT:  I understand that.  So it's really just

4     the meaning that, that's what --

5            MR. TORELLAS:  Yes.

6            THE COURT:  -- counsel is trying to dispute that and

7     undercut it.

8            I'm not trying to trick you here under catchup

9     position, I'm just really trying to understand the limits of

10    it.  And so --

11           MR. BAUER:  As for the extension of that, though, if

12    that quote didn't exist, we think that you know -- if you

13    didn't say that he possessed the power, you know, and we need

14    to look at whether he's exercised the power, et cetera, we

15    think there is questions that need to be answered as to those

16    facts, whether he exercised the power, given his ownership,

17    given the fact that he said he possesses --

18           THE COURT:  Right.

19           MR. BAUER:  Yeah.

20           THE COURT:  Right.  Right.  So, again, I think

21    you're saying what you said before which is, really being a 50

22    percent owner on paper isn't enough.

23           But if he said I have the authority to do this

24    whether you exercise it or not, your position is, he's an

25    employer because he had the power to hire and fire and set

1    work conditions and pay it, et cetera.

2              MR. BAUER:  Yes.

3              THE COURT:  Okay.  And Defendant's counsel is

4    disagreeing.  He thinks that there needs to be more.

5              MR. TORELLAS:  And there isn't.

6              THE COURT:  And that that statement doesn't --

7              MR. TORELLAS:  I guess --

8              THE COURT:  If I read it in the context of --

9              MR. TORELLAS:  -- it is subject to interpretation if

10   you read the whole line of questioning and before and after I

11   think you'll agree with the fact that it's --

12             THE COURT:  Do you have it in front of you right

13   now?

14             MR. BAUER:  Yeah, I have it here.

15             THE COURT:  Okay.  It's in the Bauer Declaration,

16   right?

17             MR. BAUER:  Yes, Your Honor.  It's exhibit --

18             THE COURT:  Exhibit I?

19             MR. BAUER:  Which exhibit?

20             THE COURT:  I think it's I.

21             MR. TORELLAS:  I, I believe.

22             THE COURT:  I.  I think it's I.

23             MR. BAUER:  It's several declarations so to make

24   sure that's the right same declaration.

25             THE COURT:  It's the January 31st, I think.

37

1          (Pause.)

2                MR. TORELLAS:  N.  Exhibit N is the excerpts.

3                THE COURT: Exhibit what?  N?

4                MR. TORELLAS:  N, as in Nancy.  Yeah.

5                THE COURT:  Okay.

6                MR. BAUER:  I might be referring to a different

7      declaration, Your Honor.  If you're referring --

8                THE COURT:  I may be wrong, so tell me what you

9      think it is.

10               MR. BAUER:  The declaration dated January 31st,

11     Exhibit I.

12               THE COURT:  Yes.

13               MR. BAUER:  And it's been attached to several

14     declarations so we all might have had a different one.  It

15     probably was the same excerpt.

16               MR. TORELLAS:  Oh, I'm looking at my general intent.

17               THE COURT:  Yes, that's what I have.

18               MR. TORELLAS:  Okay.

19               THE COURT:  I'm just looking for the page where it

20     is.  Okay.

21               MR. BAUER:  And, Your Honor, we have the quoted text

22     begins on line 7 of page 129.

23               THE COURT:  Hold on just one second.

24               MR. BAUER:  Oh, sorry.

25               THE COURT:  Not there.  I'm having trouble finding

1    it.

2         (Pause.)

3              THE COURT:  Staring me right in the face.  Okay.

4    Thanks.  And you're on where, what page?  Which --

5              MR. BAUER:  Yes, it's on page 129.  And if you begin

6    on line 7 you can see that first question and answer really

7    resolves the issue that we're discussing here.

8              THE COURT:  So the --

9              MR. BAUER:  It reads, Your Honor, starting on line

10   7.

11             THE COURT:  Uh-huh.

12             MR. BAUER:  "And although that was only on paper,

13   that still gave you certain degree of authority over Royal

14   Crown if you had chosen to exercise it, correct?"

15             "Correct."

16             And then from there we go into, you know, each

17   element of his authority.  Did you have the authority to hire

18   or fire?  Did you have the authority to set wages, et cetera.

19   That goes through page 130, line 10.

20             THE COURT:  Okay.  And that just sharpens the issue

21   of whether or not having the power, but not exercising it, is

22   legally sufficient.

23             MR. TORELLAS:  My point is, if you look at the

24   questions before and after, and I think I had included the

25   entire transcript. I don't know if --

1          THE COURT:  Okay.  Tell me where to start.

2          MR. TORELLAS:  -- it's in that.  One twenty-eight,

3     line 19.

4          THE COURT:  Question, "And so before 2007."  Is that

5     it?

6          MR. TORELLAS:  Yes.  "You were partners on paper

7     only."

8          Then they go into the questioning that Plaintiff's

9     counsel is referring to.

10          MR. BAUER:  Miguel, if you could just identify the

11     exhibit you're reading off of?

12          THE COURT:  It's just one page before where you

13     were.  Page 128.  It's --

14          MR. TORELLAS:  Could we have a copy of yours, Your

15     Honor?

16          THE COURT:  Do you need the whole thing?

17          MR. TORELLAS:  We have page 127 and then it goes to

18     129 in our --

19          MR. BAUER:  Check the other exhibit.

20          THE COURT:  Okay.  Do you want to look at -- here,

21     why don't I make a copy?

22          MR. BAUER:  Of course, that happens to be the two

23     pages.

24          THE COURT:  This is why I keep photocopiers at the

25     bench.  So I'll just make a copy for you --

```
1              MR. BAUER:  Thank you, Your Honor.

2              MR. TORELLAS:  And 131 also, in case you don't have

3       it.

4              THE COURT:  Do you have 131?

5              MR. BAUER:  No, Your Honor.

6              THE COURT:  Okay.

7              (Pause.)

8              THE COURT:  You have 129, correct, but not 130 and

9       131?

10             MR. BAUER:  Correct, Your Honor.  We have 129 and

11      130.

12             THE COURT:  Okay.

13             MR. TORELLAS:  They just need 131.

14             THE COURT:  You just need 131?  Okay.  Oh, I don't

15      have 131 either.  Ours stops at 130.

16             MR. TORELLAS:  Okay.

17             THE COURT:  Here is 128.  Means you probably have it

18      up -- did you put it up there?

19             MR. TORELLAS:  And then there would be Joseph

20      Generoso.

21             THE COURT:  Oh, the big one there?  So you need 131?

22      It goes to 218.  Goes from 129 --

23             MR. BAUER:  Is it --

24           (Pause.)

25             THE COURT:  Well, if you want to give me 131, I'll
```

1     just copy it.

2               MR. TORELLAS:  All right.  Well, I have the --

3               THE COURT:  Yes, I can do it.

4               MR. TORELLAS:  Yes.

5               THE COURT:  You don't have to take it out if you

6     don't want.

7               MR. TORELLAS:  Oh, it's okay.  I've got stickies all

8     over the place.

9          (Pause.)

10              MR. TORELLAS:  Well, my point, Your Honor, is if you

11    look at the line of questioning starting at page 128 through

12    131 -- I think it's clear, and I guess it's subject to

13    interpretation by the Court, that Mr. Generoso was responding

14    to what he thought were hypothetical questions and

15    interpretations.

16              And that's why on page 131 here he says, legally,

17    yes.  You know, he's trying to draw a legal conclusion as best

18    he can without being an attorney.

19              He's not saying that I knew I had the authority the

20    whole time and decided not to use it.  He's basically --

21    they're asking him, well, you know, if you're here on paper

22    because somebody said you could be held liable, he's basically

23    he's saying, I guess so.  That's my interpretation of it.  But

24    I guess the Court could decide that.

25              MR. BAUER:  Well, Your Honor, just with respect to

42

1    the one point where he says, "legally, yes," that specific

2    answer was in response to a completely different question

3    about whether he was responsible for paying bills.  It didn't

4    have anything to do with his authority over the plaintiffs.

5         But what's more, Your Honor, we go back to the quote

6    on page 129, line 7.  You know, this was not a hypothetical

7    exercise.  He was asking him, you know, you still had a

8    certain degree of power.  Even though it just was on paper,

9    you still had this authority.  And he said yes.  And he

10   repeated that same sentiment --

11        MR. TORELLAS:  If you had chosen to exercise it.

12        THE COURT:  But I think that's highlighting your

13   difference, your disagreement on it about the law because --

14        MR. TORELLAS:  Right.

15        THE COURT:  -- I think you both agreed factually

16   that on paper he was 50 percent owner.

17        MR. TORELLAS:  Yes.

18        THE COURT:  And that he knew that he had the

19   authority, if he wished to exercise it, to do all the things

20   we just discussed.  And the question is, as a matter of law,

21   is that sufficient.

22        MR. BAUER:  Correct.  Correct, Your Honor.  It

23   wasn't just -- right.  It wasn't just a matter of name on

24   paper.  It was that he actually did possess this authority.

25   That's the key point.

43

1              THE COURT:  Right.

2              MR. BAUER:  And so that's your disagreement?

3              MR. TORELLAS:  Yes, Your Honor.

4              MR. BAUER:  Yes, Your Honor.

5              THE COURT:  Okay.  Good to clarify that.  All right.

6    What else?

7              MR. BAUER:  So yeah, so that finishes Joseph.

8         There's still several other defendants against whom

9    Plaintiffs are entitled to summary judgment.  John Franco and

10   Royal Crown Antico Panificio, the same issue there, Your

11   Honor.  John Franco testified that starting on August 2008

12   Royal Crown Antico Panificio began operating out of 6512 14th

13   Avenue with himself as the sole manager, the sole operator of

14   the business during that time.

15             And again, going back to Plaintiff's testimony about

16   their hours and wages, about whether there's violations, the

17   same issue that we agreed earlier, you know, there's no real

18   dispute about that.  You know, those two things overlap.

19        Therefore, because John Franco, you know, was the sole

20   operator and manager of this business during the same time

21   that the plaintiffs were working there, you know, he possessed

22   that same power and he was there for an employer.

23             And this goes from the time period August 2008

24   through August 2011.

25             MR. TORELLAS:  Can I address that?

1          THE COURT:  Yes.

2          MR. TORELLAS:  There seems to be -- well, two

3    things.  One is if Royal Crown Antico Panificio is going to be

4    held liable then that basically undercuts the argument that

5    Joseph Generoso should be liable through 2012 because then

6    it's another entity that actually took over.  That's number

7    one.

8          But as far as John Franco specifically, that seems

9    to be conflicting testimony because at his deposition he

10   testified that he didn't know the plaintiffs; that he actually

11   got rid of the staff and hired his own people and did a lot of

12   the work himself.

13         So therefore his testimony then, at least, raises an

14   issue of fact precluding summary judgment that he basically

15   said that he didn't need them anymore; that he basically

16   started doing all the banking himself.

17         So there's a question about whether they were even

18   employed there.  They say they were, he says they wasn't.

19   That they weren't.

20         And as far as -- even after August of 2008, the

21   plaintiffs have testified that they kept going to Frank

22   because he was the one that owed them money.

23         At no time did they call John Franco, consider him

24   to be their boss, because even up until they left in 2011,

25   supposedly, they kept going to Frank, even went to his home

1    asking for money because they always considered Frank to be

2    the boss, and Frank to be the one that was in charge of their

3    wages.

4           So I think that basically precludes summary judgment

5    against John Franco and Royal Crown Antico Panificio.

6           THE COURT:  Anything to add?

7           MR. BAUER:  Yes, Your Honor.

8           So again, we get back to the same issue that we had

9    discussed earlier.  You know, the fact that there was another

10   defendant liable, the fact that there's more than one other

11   defendant liable, does not preclude the fact that John Franco

12   is liable.  And you know, you can have more than one employer

13   at any one given time.

14          So the fact that there were other defendants liable

15   for the same time period does not preclude a finding of

16   liability.  Very often there's more than one employer liable

17   under the law, as is the case here.

18          With respect to John Franco's testimony as to the

19   Plaintiffs' hourly wages, we don't think that testimony

20   creates any genuine issue in this case.

21          As an initial matter there was nothing from the

22   Defendants disputing Plaintiff's testimony until John Franco's

23   testimony.  Plaintiffs testify here, the damages inquest for

24   the default judgment motion, there was no cross-examination

25   under testimony.  That testimony went unchallenged.

1    Defendants did not deny Plaintiff's claims in their answer

2    with respect to their hours and their wages.

3         It wasn't until John Franco's testimony, which by

4    itself we don't believe creates any genuine issue because the

5    testimony itself, it's improbable and it's inconsistent to a

6    degree that it simply does not create a genuine issue under

7    the law.  And we cite to the *Jeffries* case in our papers as

8    supporting that proposition.

9         The testimony, Your Honor, if it's to be believed,

10   John Franco worked at this bakery by himself for six, seven

11   days a week.  He baked enough bread to -- I think it was

12   $250,000 of revenue per year.  He baked enough bread by

13   himself.  He baked bread with a recipe that Joseph Generoso

14   admitted requires you to start baking the night before because

15   it takes so long to bake this bread.

16        So if John Franco's testimony is to be believed, he

17   was in this bakery himself 24 hours a day for seven days a

18   week baking bread, in addition to all the other

19   responsibilities that go with running a bakery.  The business,

20   dealing with customers.  It's simply too improbable to

21   believe.

22        Not to mention that it's inconsistent in light of

23   other defendant's testimony, and in light of his own

24   testimony.  He testified in his deposition that the plaintiffs

25   were never there.

1          If you look at Theresa Generoso's deposition she

2     said that the plaintiffs were there delivering bread from

3     Royal Crown, from the 6512 Bakery to Magnifico Catering; that

4     they were doing this during the time period when John Franco

5     says they weren't there.

6          John Franco's testimony is also contradicted

7     internally by himself.  He testified in his deposition that he

8     took over Royal Crown Antico Panificio, excuse me, began

9     operating in August 2008.  But his affidavit then says it

10    didn't start operating until 2011.  There's an internal

11    inconsistency there.  It's too improbable to believe, Your

12    Honor.  We don't think it creates a genuine issue, and we

13    don't think that it, you know, it offers complete summary

14    judgment in Plaintiff's favor.

15         THE COURT:  So, although the Court is not supposed

16    to look at credibility, or weigh credibility, you're saying

17    that the testimony isn't weighty enough for the Court to find

18    that there is a material issue of fact, or it's inconsistent?

19         MR. BAUER:  Yes, Your Honor.  We think as an initial

20    matter that that *Jeffries* case in the Second Circuit, that

21    says it's not a credibility issue if the testimony is so

22    improbable and so inconsistent, you know, that a juror needs

23    to suspend this belief to give it any credit.  That's not a

24    credibility issue.  That precludes summary judgment.

25         Not to mention the fact that, you know, this goes to

1    the issue that we had discussed at the beginning of today's

2    hearing where the Defendants did not dispute what they -- did

3    not challenge the first issue about violations or damages.

4    You know, they conceded that point.

5              So if they conceded that point, Your Honor, that

6    goes to the Plaintiffs' hours and wages, how can John Franco's

7    testimony rebut that, you know, if they've already conceded

8    it?

9              THE COURT:  Say that one more time.

10             MR. BAUER:  Yes.  Earlier in today's hearing when we

11   were discussing the first issue, the violations and the

12   damages --

13             THE COURT:  Right.

14             MR. BAUER:  -- I think what we came out of that was

15   that the Defendants did not -- excuse me, that the Defendants

16   conceded that point and they were not challenging them.

17             And that John Franco's testimony lies in the face of

18   that concession because it says that they weren't working

19   there the hours that they said they were working.  So, Your

20   Honor, we don't see how the defense can rely on that testimony

21   when they've already conceded the point.

22             MR. TORELLAS:  Your Honor, on a summary judgment

23   motion I think the basic rule is that the Court's role is to

24   find whether issues exist.  Not to determine credibility and

25   not to determine, you know, the issues and things of that

1    nature.

2          I think by virtue of the fact that under sworn

3    testimony, John Franco Generoso testified one way that

4    directly contradicts the Plaintiff's testimony in and of

5    itself, raises an issue that precludes summary judgment.

6          The fact that he formed the business as far as

7    contradicting himself, the fact that he formed the business

8    back in 2008, but didn't actually take over the business at

9    6512 and 2011, is not contradictory at all.  You know, quite

10    often people form businesses and actually don't exercise the

11    power and take over the business until a later date.

12          Like I said, I think it's very clear that, you know,

13    the fact that under oath in sworn testimony at a deposition,

14    he made the statements that he made, precludes summary

15    judgment.  I think it's an issue of credibility.

16          MR. BAUER:  Well, first, Your Honor, the test is not

17    whether there is a question of fact.  The test is whether

18    there's a genuine issue of fact.

19          And again as we discussed, we don't think that the

20    testimony gives rise to this genuine issue because even at the

21    time of the deposition it was so improbable.

22          And if credit is going to be given to this testimony

23    then, you know, we questioned why did the Defendants concede

24    the issue of violations and damages if this testimony rebutted

25    that issue.

1        And we ask why as laid out in our papers, why John

2    Franco Generoso, on the record was giving instruction by his

3    own counsel about perjury and, you know, the fact that he was

4    testifying under oath.

5        We think those are facts and things to look to to

6    show that this evidence -- that this testimony is not

7    sufficient to create any genuine issue of fact.

8        MR. TORELLAS:  What we conceded to, Your Honor, was

9    the fact that the Plaintiffs had worked under conditions that

10   violated the statute.  We didn't specify a time period.  We

11   didn't specify an employer.  We just specified that at some

12   point in time they worked under those conditions.

13       That doesn't mean that we're conceding the fact that

14   John Franco was an employer of theirs or that Royal Crown

15   Antico Panificio was an employer of theirs.  That's still an

16   issue for determination, you know, by the Court.  So the

17   motion -- otherwise they wouldn't need the rest of the motion.

18       And I would think that the fact that whether or not

19   Royal Crown Antico Panificio and John Franco were actual

20   employers is an actual genuine material issue of fact in the

21   case.  So.

22       THE COURT:  Okay.

23       MR. BAUER:  Well, just to that last point I would

24   say, first, to the extent that there is a question of fact

25   because of John Franco's testimony, it doesn't come in until

1    August 2008.  Before that, from September 2006 to August 2008,

2    which is part of the relevant time period here, you know, John

3    Franco's testimony doesn't apply and there's no dispute

4    whatsoever about Plaintiff's testimony as to their hours and

5    wages.

6              Secondly, it was my understanding that when we were

7    discussing this first issue, you know, I'm not sure I

8    understand when they said there was no time period discussed,

9    you know, our papers made clear that this was the first issue

10   that we had violations and damages for a certain time period

11   to a certain amount of damages.  So we think that that is part

12   of that first issue that we resolved earlier today.

13             THE COURT:  Counsel disagrees.  Okay.  We'll let the

14   record decide that.

15             Any other points you want to make?

16             MR. BAUER:  I think that is -- the last point, Your

17   Honor, and this does not go to Plaintiff's motion, this goes

18   to Defendant's motion is the issue of Theresa Generoso.

19   Plaintiffs have not moved for summary judgment against her.

20   Defendants have.  And with respect to her we would just say,

21   that the reason that Plaintiffs didn't move is because there

22   are genuine issues as to her involvement.

23             There's competing testimony.  Plaintiffs have

24   testified -- I'm sorry, she testified that she worked at the

25   6512 Bakery with the plaintiffs, that she was there

1    frequently, regularly, and that there's testimony from the

2    plaintiffs that she paid them from time to time, that they

3    went to her for their pay.  Meanwhile she testifies that she

4    didn't have anything to do with them.

5          So we think with respect to her, there's a genuine

6    issue that would preclude summary judgment and that's the

7    reason why we didn't -- Plaintiffs did not move as against

8    her.

9          MR. TORELLAS:  Quite simply on that fact, her

10   testimony was that she worked a couple of summers at the

11   bakery, behind the counter, taking care of customers.  She

12   testified she never gave them orders.  She may have handed

13   them a paycheck once in a while.

14         And other than that, shortly thereafter she formed

15   Magnifico Catering and she wasn't there anymore.  It was

16   basically a summer job after school.  And that doesn't rise to

17   the level of holding her liable as an employer.

18         She had no authority.  She had no control over them,

19   didn't tell them what to do, didn't hire them, didn't control

20   their rate of pay.  None of that applies to her so I feel that

21   summary judgment in her favor is warranted.

22         MR. BAUER:  Well just quickly in response to that,

23   you know, I think the point to take away here is that we don't

24   know the extent to which she was really involved.  Again,

25   there is testimony that she was involved in paying them and

1    signing off on their paychecks, and there's testimony that she

2    was not involved in that activity.  So we think that's

3    something that should be resolved at trial to fully understand

4    whether and to what extent she was involved with Plaintiffs'

5    employment.  So that's why we think that we preclude summary

6    judgment on that.

7           THE COURT:  I understand.  On your motion for

8    summary judgment, do you have some issues you'd like to bring

9    up?

10          MR. TORELLAS:  Well, I think we've pretty much

11   covered everything.  I think for the same reasons that we've

12   discussed before, I think summary judgment is warranted in

13   favor of Theresa for the reasons I just stated.

14          John Franco, it's based pretty much on his

15   deposition testimony that he didn't hire the plaintiffs.  And

16   I understand that there is an issue of credibility there.

17          But as far as Joseph I think it's pretty clear that

18   given his testimony that he didn't have control of the day-to-

19   day operations, or he did not hire the plaintiffs, he didn't

20   control their rate of pay, it basically comes down to the same

21   issue as before, whether his authority, just being on paper is

22   enough.  We feel that it wasn't and we feel that summary

23   judgment is also warranted in his favor.

24          THE COURT:  And what about Asmal?

25          MR. TORELLAS:  Asmal is one of the plaintiffs.

54

1          THE COURT:  Whether or not he's exempt.  Is that an

2    issue still?

3          MR. TORELLAS:  Well, I mean, he was the night

4    manager.  He did receive a weekly salary.  I think that's a

5    point for the Court to consider.

6          You know, it's basically pretty clear that once you

7    reach a certain level you're considered a manager and you get

8    paid weekly.  Some of the same requirements don't apply to you

9    and we feel that Asmal falls into those categories.

10         He was made a manager back in the late '90s and was

11   receiving a weekly salary.  And I think that's what's

12   controlling.

13         MR. BAUER:  So with respect to that issue, Your

14   Honor, as an initial matter the management exception is an

15   affirmative defense, which was raised by Defendants but not

16   raised in their pleadings.

17         Notwithstanding that, the burden is still on the

18   Defendants to establish that affirmative defense.  And it's

19   not just that he was given the title manager, even if he was

20   given the title manager, the test there is that management

21   must have been his primary duty and that he must have had a

22   certain level of authority over the plaintiffs.

23         Similar, a little bit less than an employer, but he

24   must have had that type of authority over somebody under him;

25   power to control their employment, to tell them what to do, et

1    cetera.  Defendants have offered no evidence for that, to

2    establish that against -- it's their burden.  They've offered

3    no evidence there, and again, they've waived it by not raising

4    it in their pleadings.  We think that's a non-issue, Your

5    Honor.

6              THE COURT:  On the joint and several liability

7    issue, is that anything that you need to add anything to

8    that's not in your paper, is there?

9              MR. BAUER:  No, Your Honor.  To the extent that

10   there are multiple employers for any given time period, you

11   know, as a matter of law joint and several liability will

12   attach to them for their damages in this case.  So I think

13   it's just a matter of who was an employer for what time

14   period.

15             THE COURT:  Okay.  Great.  Anything else to discuss?

16             MR. BAUER:  Nothing from Plaintiffs, Your Honor.

17             THE COURT:  All right.

18             MR. TORELLAS:  Nothing from Defendants, Your Honor.

19             THE COURT:  Thank you very much.  I'm glad you knew

20   the record so well.

21             MR. BAUER:  Thank you, Your Honor.

22             MR. TORELLAS:  Thank you, Your Honor.

23             THE COURT:  Good night.

24        (Proceedings concluded at 3:25 p.m.)

25

56

1          I, CHRISTINE FIORE, Certified Electronic Court

2     Reporter and Transcriber and court-approved transcriber,

3     certify that the foregoing is a correct transcript from the

4     official electronic sound recording of the proceedings in the

5     above-entitled matter.

6

7     *Christine Fiore*

8     _____          March 18, 2014

9          Christine Fiore, CERT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24